**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jordan M. SCHER, Defendant-Appellant.**

**No. 72–1321.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1972.

Decided March 30, 1973.

Rehearing Denied April 26, 1972.

George D. Crowley, Warren R. Fuller, Richard L. Manning, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Glynna W. Freeman, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and PELL, Circuit Judge.

PELL, Circuit Judge.

Defendant Jordan M. Scher, M.D., a psychiatrist practicing in Chicago, was charged in a three-count indictment with willfully and knowingly attempting to defeat and evade payment of a portion of his federal income taxes due for 1964,

1965, and 1966,[1] in violation of 26 U.S.C. § 7201.[2] After a bench trial, Dr. Scher was found guilty on all counts and received a sentence of three years' probation, the first 90 days to be served in a jail-type institution.

Scher concedes that there were understatements in each of the indictment years resulting from the cashing of patients' fee checks. The sole issue on this appeal is whether the evidence was sufficient to establish that the defendant had the requisite criminal intent.

■■ As an appellate court, we cannot, of course, decide anew the defendant's guilt or innocence. *See* Kotteakos v. United States, 328 U.S. 750, 763, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Rather, our task in this case is to determine if a rational trier of fact could have found beyond a reasonable doubt that Dr. Scher violated 26 U.S.C. § 7201. In so doing, we must view the evidence and all reasonable inferences therefrom in the light most favorable to the Government. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

I

Scher's certified public accountant for the years in question, Frank Baker, relied on the doctor's bank deposits to compute the gross income from his medical practice. During those years, Scher had only one checking account. From the defendant's office files or from his employees, Baker obtained the monthly bank statements. He then totalled the deposits made during the calendar year. Next he deducted certain items, such as patients' returned (NSF) checks, from the annual deposits total. Because Dr. Scher was paid primarily by check, if these checks were not cashed but were deposited in the bank account, that account over a year's time would reflect the defendant's gross income from his medical practice for that year.

Beginning in 1963, however, Dr. Scher, or one of his employees at his direction, cashed some of the incoming checks at two currency exchanges near the doctor's office. According to deposits journals that the defendant's staff maintained, checks were cashed at least sixteen times during the three-year period covered by the indictment. Each transaction involved from one to twenty-one checks and from $1024.80 to $4019.72. Dr. Scher personally endorsed the checks to be cashed. After each transaction, the proceeds were given to the defendant, who placed them in a private safe in his office.

The accounting method adopted by Baker differed from that used by his predecessor, Erwin Waxler, who had

1. The indictment alleged that Dr. Scher had underpaid $1,949.57 in income taxes in 1964, $3,800.52 in 1965, and $2,719.45 in 1966.

| Year | Taxable Income Per Return | Tax Due Per Return | Indictment Taxable Income | Indictment Tax Due |
|------|---------------------------|--------------------|--------------------------|--------------------|
| 1964 | $ 9,031.45 | $1,925.06 | $14,546.73 | $3,874.63 |
| 1965 | 8,317.39 | 1,682.43 | 18,776.42 | 5,482.95 |
| 1966 | 11,206.64 | 2,576.13 | 18,279.06 | 5,295.58 |

These figures do not reflect the total amount of gross income not reported as the returns also failed to include some allowable deductions and there was some double reporting of income. Our inquiry is directed to the matter of willful intent as to the omission of income, although, of course, we do not ignore in deciding this case the fact that not all of the taxpayer's derelictions were in his own favor.

———◆———

2. 26 U.S.C. § 7201 (1971) reads:

"Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

prepared Dr. Scher's returns for the calendar years 1960 through 1962. In addition to reviewing the defendant's bank statements and cancelled checks, Waxler analyzed a receipts journal containing the names of the patients billed, the amounts received, and the dates of receipt and a disbursements journal, both of which were kept in Scher's office. Waxler would then compare the total amount of the receipts as recorded in the receipts journal, which, *inter alia,* listed all checks received, whether deposited or cashed, with the total amount of the deposits indicated on the bank statements. For the years that Waxler prepared the returns, the total bank deposits agreed with the total entries in the receipts journals. However, during these years, Scher was depositing in his bank account substantially all the patient fee checks he received.

At trial, Baker stated that he had never discussed with Scher the method by which he computed Scher's income. Exclusive reliance on the "bank deposits method" of determining income supposedly had been his own idea. Waxler also testified that when he had worked for Scher he had not explained to him how he calculated the income.

Scher contends that this and other testimony disproves the validity of the trial judge's finding of willfulness. The maintenance of accurate records by Scher's employees and the defendant's openness in cashing the checks allegedly were inconsistent with a willful intent to evade taxes. Apparently Scher attributes the understatement of his income in 1964, 1965, and 1966 to poor communication between Baker and himself and to the accountant's "sloppiness" or incompetence. Defendant relies on United States v. Pechenik, 236 F.2d 844 (3d Cir. 1956), in which the Third Circuit overturned the conviction of a corporation president for willful evasion because the record failed to reveal probative evidence linking the defendant with the corporation's erroneous accounts books and tax returns.

Although both *Pechenik* and the present case involve charges of individual criminal liability for tax evasion, there could well be underlying differences between the situation of a corporation officer who perforce must depend upon bookkeepers, auditors, and accountants for the preparation of books relating to financial matters not under his personal dominion and the situation of a person dealing with his own individual income all of which was derived from personal services rendered by him.

## II

We first note that "a taxpayer cannot shift the responsibility for admitted deficiencies to the accountants who prepared his returns if the taxpayer withholds vital information from his accountants, or takes positive action designed to mislead them." Bender v. Commissioner of Internal Revenue, 256 F.2d 771, 774 (7th Cir. 1958). That Scher did not conceal his check cashing from his employees does not foreclose the conclusion that he was consciously reticent about telling his accountant about the practice. Baker, unlike his predecessor, visited Scher's office only a day or two each year, in February or March.

Second, because the parties stipulated to many of the facts, the credibility of the witnesses, especially Baker and Scher, is important here. We must rely heavily on the evaluation of the trier of fact as to the credibility of the witnesses. The district court judge obviously found Baker a less than credible witness. Baker himself conceded that he simply could not remember "each and every conversation since I have been engaged with [the doctor] over nine years ago." Further, even the "cold" record suggests that the accountant had been evasive, irritable, and somewhat inconsistent at trial. The judge also found Dr. Scher to be an unpersuasive witness.

The defendant correctly points out that a finding of guilty cannot be

predicated solely upon disbelief of witnesses' testimony. See United States v. Pechenik, *supra*. However, we do not therefore conclude that such disbelief is irrelevant to our review. *Cf*. Judge Learned Hand's statement that

"the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is a part of the evidence. . . . [W]e have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale. Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story . . . ." Dyer v. MacDougall, 201 F.2d 265, 268–269 (2d Cir. 1952) (footnote omitted).

We also disagree that the trial judge relied on no positive evidence. "It is clear that the Government need not adduce direct proof of intent. It may be inferred from the defendant's acts. . . . The same applies to knowledge that additional amounts were due, and a jury may return a verdict of guilt under this section, [26] U.S.C. § 7201, based upon circumstantial evidence alone." United States v. Spinelli, 443 F.2d 2, 3 (9th Cir. 1971). See also W. La Fave & A. Scott, Handbook on Criminal Law § 28, esp. at 203 (1972).

Baker testified at trial that he had had no discussion with the defendant as to what books and records Scher kept. Yet Baker stated that, during the years in question, he had examined the disbursements journals, and he admitted that he had known of the existence of books listing checks received, although he claimed he had never seen them, had made no inquiries about them, and had not known who in the office maintained them. Waxler regularly had requested from defendant's employees—and had removed from Scher's office for study—both the receipts journals and the disbursements journals.

One reason Baker gave for his failure to consult the journals was his wish to avoid disturbing the defendant's confidential relationship with his patients by knowing their names. Although he denied at trial that Scher had ever cautioned him about doctor-patient confidentiality, he had earlier testified before the grand jury that he had discussed that topic with Scher and that Scher had not wanted him to have that information. In his trial testimony, the defendant denied that he had told Baker not to look at any documents that had patients' names on them.

Dr. Scher knew that all his receipts had been entered in office books. Indeed, his staff gave him the volumes when completed. Although he testified that he had never instructed his employees not to give the records to his accountant, when Baker failed to ask him for records, he did not offer him the receipts journals (or even the deposits journals) or order an employee to show them to Baker. Furthermore, he never mentioned to Baker that he or others at his direction had cashed thousands of dollars worth of checks. This information not having been communicated and the accountant having failed to examine the books initially on his own, his knowledge of the true status of his client's income never departed from its cimmerian refuge, a situation susceptible of easy and quick remedying by the imparting of the withheld information.

Baker testified that each year he spent a day or two in the defendant's office gathering data for the tax returns and that he had brief discussions with Scher two or three times on each of those days. On the worksheets Baker developed for 1965 and 1966, the gross income figure had been listed "per deposits." The accountant declared, however, that he had not shown Scher these worksheets. Instead, Baker would ask the defendant about particular items and would tell him the gross figures he had calculated. From the defendant's records, the Government determined that in 1964 checks totalling approximately $16,500 had been cashed, that in 1965, the sum had been about $12,300, and

that in 1966 the total had been $8400. Thus, there was a substantial discrepancy between the gross income that Baker quoted to the defendant and the total fees Scher had actually received. Although the defendant had not kept his own personal account of the check cashing totals, he testified that, at least as to 1964, he had known that he had cashed thousands of dollars worth of checks. The trial judge obviously considered Scher's failure to notice and comment on these discrepancies a circumstance suggesting that the defendant had been less than open with his accountant. Scher apparently also gave Baker no positive information in response to Baker's asking if he knew of "any other items which would probably be recorded in the income tax return."

In 1966, a revenue agent interviewed Scher and Baker regarding Scher's 1964 return. He inquired whether "receipts [were] received entirely by check and [were] deposited in total in one checking account by taxpayer's secretary." The record is unclear as to who answered the query, Baker or the defendant, but an affirmative answer was given and both were present. In 1968, a special agent of the IRS interviewed the defendant and his accountant. He read aloud part of the audit report made by the revenue agent in 1966, including the statement: "Receipts are received almost entirely by check and deposit[ed] *in total into one checking account* by the taxpayer's secretary." [Emphasis added.]

The special agent then asked Scher "had that same practice followed in 1963 as well as 1964?" and the defendant stated it had. The agent then explained that the Government had learned that some checks from patients had been negotiated at a currency exchange and that the agent wished to determine whether they had been reported as income. Once Scher understood that the agent was speaking about checks cashed in 1964, he accused his former wife of forging endorsements on patients' checks and of cashing them in 1963 and 1964. He did

not mention the checks that he had had cashed, which, as indicated, represented a substantial amount of money. Further, Scher specifically denied cashing any checks in 1963 or 1964 at a certain currency exchange, which exchange, the trial evidence showed, had been used for Scher's check cashing activities. At trial, Scher could remember little of this conversation he had had with the special agent in 1968.

It is to be noted that this damaging testimony as to Scher's proclivity for "covering-up" was not put in for impeachment purposes. Scher had not yet testified, and the misstatements had their own independent probative value.

Dr. Scher denied at trial that his cashing of the checks at the currency exchanges and placing the proceeds in a private safe was for the purpose of evading his tax obligations. He explained his hoarding of thousands of dollars by detailing personal and professional problems he had had at the time. The money allegedly gave him a sense of security. He also claimed that, in addition to his other problems, he had had financial difficulties. Accountant Waxler, he thought, had left his employ because he had been too slow in paying him his fees. According to the defendant, the cash hoard remained unused until 1968, when he invested some of it in stocks.

From the above evidence, the trier of fact could reasonably have inferred that Dr. Scher was deliberately withholding necessary information from his accountant and that he was attempting to use the resulting inadequate communications with Baker to his advantage. From the circumstances presented, some of which by themselves seemed innocent, the judge was justified in finding a damning pattern. The Government's case satisfied the requirement of Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943), that a "willful and positive attempt to evade tax" means more than a "[w]illful but passive neglect of the statutory duty." Defendant admitted that he was experi-

encing financial problems. The employment of an accountant using a different method of computing income from that followed by his predecessor was indeed fortuitous for Dr. Scher, who had begun to cash checks in substantial amounts. The district judge could reasonably have found it highly questionable that Baker, a CPA with over thirty years' experience, would, without any knowledge of his new client's practices, adopt the "bank deposits method" of calculating that client's income. But the ultimate responsibility returns to Scher's concealment. The inconsistencies in Baker's testimony and the knowledge he displayed of Scher's procedures, *e. g.*, that the defendant was paid primarily by check, support the inference that Baker had been led to believe that the method he adopted accurately reflected Dr. Scher's gross income.

The trial judge also properly noted that the defendant was not completely isolated from the preparation of his income tax returns. Baker did discuss tax matters with him each year. It was within the province of the trier of fact to disbelieve that these discussions concerned deductions and expenses only and that the defendant could have failed to be aware of the great discrepancies between the amount of fees he actually received in a year and the gross income figure that his accountant cited to him.

Finally, the defendant's evasiveness and misstatements when interviewed by the special agent of the IRS in 1968 strongly suggest conscious wrongdoing. And, as the trier of fact commented, the defendant's explanation of why he cashed the checks rather than depositing them in a bank—where he could have earned interest, which, presumably, would have enhanced the sense of security large sums gave him—and his ultimate use of his tax-free hoard bolster the inference that defendant was willfully attempting to evade his income taxes. Although it is true, as we noted in footnote 1 of this opinion, that there were errors in the questioned income tax returns which redounded to Scher's favor,

this is a matter of argument only, and we cannot say that it is sufficient to do away with the willful intent to evade as found by the trier of fact.

 Having considered the totality of the circumstances and the inferences that one could reasonably draw from them, we hold that the evidence was sufficient to support the district court's verdict. Accordingly, the judgment of conviction is affirmed.

Affirmed.